UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA,

       Plaintiff,                  Criminal No. 16-cr-20552

v.                                Honorable Arthur J. Tarnow

D-1 SEBASTIAN GREGERSON,
  a/k/a Abdurrahman Bin Mikaayl,

       Defendant.
_____/

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO REVOKE ORDER OF PRETRIAL DETENTION

The United States of America, by its undersigned attorneys, respectfully submits this opposition to defendant's Motion To Revoke Order of Pretrial Detention. That motion should be denied because the defendant is charged with serious offenses involving his procurement of high explosive grenades. In addition, the defendant is a supporter of the terrorist organization, Islamic State of Iraq and the Levant (ISIL), and he acquired the explosives and other weapons to prepare to engage in violent acts aligned with ISIL. Further, while the defendant claims that all of the other weapons he possessed were legal, in fact, he bought two firearms in straw purchases and has been indicted in the Eastern District of Virginia for those offenses. The defendant also possessed another firearm that was not registered to him, as required by law. These and the additional facts set forth

below provide clear and convincing evidence that there are no conditions of release that will assure the safety of the community, and, accordingly, pretrial detention of the defendant should be continued.

## BACKGROUND

On August 1, 2016, a criminal complaint was filed against the defendant charging him with unregistered possession of a destructive device (grenades), in violation of 26 U.S.C. § 5861(d), and unlicensed receipt of explosive materials, in violation of 18 U.S.C. § 842(a)(3)(A). (Doc. #1: Criminal Complaint). On that same date, he made his first appearance and was temporarily detained. On August 4, 2016, Magistrate Judge Mona Majzoub held a detention hearing at the conclusion of which she ordered the defendant detained pending trial. The evidence cited by Magistrate Judge Majzoub included the defendant's purchase of five fragmentation grenades, the defendant's statements indicating that the five grenades were "just a start," and his expressed desire to purchase a Claymore mine. (Doc. #13: Detention Order Pending Trial, PgID 91.) The Court noted that "fragmentation grenades and Claymore mines are specifically designed to maim and kill, and are not items that are usually collected by 'hobbyists' or 'preppers.' They are inherently dangerous devices that are used in extremely violent circumstances with potentially horrific consequences." *Id.*

On August 11, 2016, a federal grand jury issued a two-count indictment containing the same charges as the complaint.  (Doc. #14:  Indictment).   On December 1, 2016, a federal grand jury returned a superseding indictment adding two additional charges, possession of a destructive device with the knowledge or intent that it would be used to harm people or property, and possession of a destructive device (grenade components).  (Doc. #22:  Superseding Indictment).

On December 14, 2016, a federal grand jury in the Eastern District of Virginia issued a four-count indictment charging the defendant with conspiracy and aiding and abetting false statements during the purchase of two firearms.  (EDVA, Case No. 1:16-cr-00292, Doc. #1).

## ARGUMENT

The defendant now asks this Court to revoke the order of detention.  The basis for detention, however, has only grown stronger since the order was entered.  Since that time, the defendant has been charged with additional offenses, both in this district and in the Eastern District of Virginia.  Further, one of the defendant's central claims for release pending trial, both at the detention hearing and in his motion, is that his possession of weapons (but for the grenades) was legal.  That claim has been entirely undermined since the initial detention hearing.

As this Court well knows, in determining whether there are conditions of release that will assure the safety of the community, the factors to be considered

include the nature and circumstances of the offenses charged and the nature and seriousness of the danger to the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g).  In this case, these factors weigh heavily against the defendant and, as such, the detention order should remain in place.

## I.  The Defendant's Identification And Alignment With The Terrorist Organization, ISIL

The defendant is charged with serious offenses relating to his possession of destructive devices, both high explosive grenades he purchased from an FBI agent acting in an undercover capacity, as well as components found at his residence to make fragmentary grenades.  The evidence further shows that the defendant's possession of these and an armory of other weapons in his possession was for the purpose of making preparations to engage in violent acts aligned with the Islamic State of Iraq and the Levant (ISIL).

The defendant came to the attention of the Detroit FBI in April, 2015, due to reporting from a confidential source who alerted the FBI that the defendant had repeatedly made expressions of support for ISIL. The source informed law enforcement that the defendant continually accessed ISIL-related web sites and had expressed his support for the violent methods ISIL employs.  According to the source, the defendant indicated that he wanted to move his family to ISIL-held territory and to remain there permanently.  The source further informed law enforcement that the defendant claimed to have grenades in his possession.

Investigators subsequently identified the Facebook account of the defendant, which had the user name, "Abdurrahman Bin Mikaayl." It appears that the defendant used an alias in order to disguise his association with the ISIL-related content. In June, 2015, investigators observed that the profile page of the defendant's Abdurrahman Bin Mikaayl Facebook page displayed men on horseback, armed and dressed for battle, and carrying the black flag of ISIL. The defendant's next Facebook profile page, which he maintained from September, 2015, until at least May 3, 2016, depicted a single horseman carrying the ISIL flag.

The defendant's Facebook posts and emails also indicated the defendant's support for ISIL. On November 13, 2015, ISIL attacked Paris in a coordinated series of suicide bombings and mass shootings in the vicinity of a soccer stadium, restaurants, and the Bataclan theatre, resulting in 130 deaths. According to records provided by Facebook pursuant to a search warrant, a posting on November 14, 2015, by the defendant about the attacks indicated his belief that the attacks were legitimate.

Records obtained through a search warrant for the defendant's email account revealed a number of e-mails also reflecting the defendant's support of ISIL. Those records indicate that this account was registered to "Abdurrahman Gregerson." Several emails sent from the defendant's email account during the time period from February 12, 2015, to March 19, 2016, praise ISIL actions with

"Allahu akbar" ["God is great'] written in the subject line and, in the body of the emails, transmit links to articles relating to ISIL, such as "ISIL fighters seize western Iraqi town;" "Boko haram leader pledges allegiance [to] Islamic state group;" "ISIS accepts allegiance of Nigeria jihadists Boko Haram;" "ISIS attack on Kurdish forces in Syria kills 16." An email sent on March 19, 2016, had the symbol of a smiling face in the subject line and in the body of the email was a link to an article entitled, "13 egypt policemen killed Sinai attack claimed." This is a reference to an ISIL suicide bombing attack on a checkpoint in the Sinai Peninsula which killed thirteen police officers.

Email records also showed that the defendant disseminated ISIL's former official magazine, *Dabiq*, via his email account. *Dabiq* was the official English language publication of ISIL. One of its aims was to recruit individuals from western countries to commit "lone wolf" attacks. Emails sent from the defendant's account during the time period from December 29, 2014, to March 31, 2015, forwarded links to issues of *Dabiq* published online by ISIL. The recipients of these emails included a radical former Imam in Maryland, whose own Facebook postings revealed staunch support for ISIL.

From April through July 2016, the defendant had several lengthy, in-person interactions with an FBI agent acting in an undercover capacity (UCE). On April 28, 2016, in Dearborn, Michigan, the defendant met with the UCE, who the

defendant believed to be a like-minded ISIL supporter, and engaged in a consensually recorded conversation. During the conversation, the defendant claimed to have all of the lectures of now-deceased radical al-Qa'ida cleric Anwar al-Aulaqi.  Anwar al-Aulaqi's violent rhetoric against the United States has been instrumental in the online radicalization of homegrown violent extremists.

During the same conversation, the defendant made references to a June, 2014, sermon by Abu Bakr al-Baghdadi, the leader of ISIL, after the takeover of Mosul, Iraq by ISIL.  In that sermon, al-Baghdadi declared the establishment of a caliphate, an Islamic state led by a religious leader. The defendant told the UCE that he watched al-Baghdadi's speech some five times that day and celebrated the event with associates.  The defendant stated: "We could not stop smiling."

It is clear that the defendant identified with individuals who carried out violent attacks on behalf of ISIL, often referring to them as "brothers" in conversations with the UCE.  The defendant also applauded ISIL's advances. For instance, in a conversation on June 2, 2016, the defendant noted that ISIL had established a stronghold in a port on the coast of Libya and stated: "They have ships.  They're not big ships, but you know, you have to start somewhere . . . As they consolidate control across Sinai and Libya and stuff, we'll get there eventually, God willing."

In the conversations with the UCE, the defendant also indicated that he watched ISIL videos, including suicide videos, and read ISIL publications in different languages. The defendant also discussed how ISIL was "coming out with statements and full lists, advocating certain things." The defendant indicated that the "ruling" from ISIL is that these actions, [i.e. attacks at home], while ISIL calls for them, are secondary to traveling to ISIL-controlled territory. "The priority is hijrah [migration]. There's not State without people." The defendant, himself, indicated a desire to travel to ISIL-controlled territory but believed that he was on the government's watch list and would not succeed in getting out of the country.

## II.    The Defendant's Accumulation of Weapons, Ammunition and Tactical Gear

Records obtained during the course of the investigation document that, in the sixteen months preceding his arrest, the defendant purchased an arsenal of weapons, ammunition, tactical gear and tactical training materials. Those items include several hundred rounds of AK-47 ammunition, multiple fixed-blade knives of significant length, a balaclava mask, road spikes, and an AK-47 training video.

During the execution of a search warrant at the defendant's residence after his arrest, among other items, investigators found assault rifles, handguns, a shotgun, a hatchet, two machetes, multiple long, fixed blade knives, and a 37mm grenade launcher and 37mm flare rounds. (*See* Exhibits 3 through 30, attached hereto, which are photographs of some of the materials recovered.) There are

documented cases of recent ISIL-inspired attacks where the preparation phase included the collection of large quantities of similar weapons and gear.

In his bond motion, the defendant contends that he is an appropriate candidate for pretrial release because the firearms "recovered from his residence were purchased legally, under his valid name."  (Defendant's Motion to Revoke Order of Pretrial Detention at 4).  This is not accurate.  Law enforcement recovered ten firearms from the defendant's residence, consisting of eight long guns (rifles and shotguns) and two hand guns.   Subsequent investigation revealed that the defendant had obtained one of the handguns, a Glock 31 .357 caliber pistol, through a straw purchaser, hiding the fact that the defendant was the true purchaser of the firearm.

The defendant used another handgun, a Beretta 9M, in exchange for the grenades he bought.  The defendant also bought that firearm through a straw purchaser.  These two straw purchases are the basis of the charges in the Eastern District of Virginia indictment.  In addition, the defendant purchased a Glock 32 .357 caliber pistol from an individual in a parking lot.  Although state law required the defendant to file the necessary paperwork to document his purchase of the firearm, he did not do so, and the firearm continues to be registered in the name of the former owner.

Not only were the firearms in the defendant's possession not all legal, as claimed, the pattern and nature of his purchases also provides reasons to consider the defendant dangerous. For instance, the nature of the defendant's purchases relating to weapons appears to have changed around 2015.  While he purchased knives in the time period from 2008 through 2013, he bought only one a year except in 2009 and in 2014 when he purchased none.  By contrast, in 2015, the defendant purchased fifteen knives.  Several of the long, fixed blade knives recovered from the defendant's residence are specifically marketed for tactical, that is, combat, utility.  These purchases roughly coincide with a flood of ISIL propaganda which encouraged followers to commit knife attacks.

In addition, the defendant purchased three firearms in the two months preceding his arrest, including two long-barreled firearms.  As Magistrate Judge Majzoub noted, the defendant's purchase of high explosive grenades, and his desire to obtain a Claymore mine, discussed below, also indicated "a willingness to act on his interest in purchasing and possessing weapons with increasingly higher destructive capabilities." (Doc. #13:  Detention Order Pending Trial, PgID 91).

ISIL has exhorted its followers in the West to provision themselves with weaponry, to cache weapons, and to otherwise prepare themselves for battle in what ISIL believes is an ongoing war between "infidels" and "believers," a war which will include a final battle that is imminent.  The defendant's statements to

the UCE also mirror this belief.  On November 14, 2015, in defending the Paris attacks on his Facebook page, the defendant stated, "the world is at war."  In conversations with the UCE, the defendant indicated that the world is divided into infidels and believers, the United States being the "land of the infidels."  During a conversation with the UCE on July 20, 2016, the defendant discussed a prisoner in Guantanamo who was charged with the attempted murder of U.S. soldiers. Gregerson criticized the charges, saying that "it's a war" and "you can't charge somebody with murder in a war."  "He's a soldier . . . Regardless of whether [a U.S. soldier] attacked you or not, it's not . . . attempted murder.  This is war."

On July 27, 2016, Gregerson also referred to his desire to supplement his self-described "armory" with five more "battle rifles" and to arm like-minded ISIL individuals with them.

> Honestly, you know I, I have been evaluating my, uh, my armory lately [laughing] and, uh, you know, just what I have, what I would like to acquire and stuff like that, you know. I'm pretty ok with the selection I've got now, there's a couple things I'd like to fine tune it out over the next few months, and there's other stuff, you know, I wouldn't mind picking up but, just as kind of my little plan thing, you know, I'm kind of ok with what I've got. There's like two things in particular I'd like to pick up, you know, to kind of round it out but, uh- . . .

> I'm just talking five battle rifles at my disposal . . .

> You know, I'm, ah, I'm, uh, I'm a long term planner, you know, it's like, like I said, if something goes down, if the crap hits the fan, something like that, then I would like to feel

> comfortable knowing I have a, uh, capability to outfit a small group . . .
>
> You know, for collective defense we'll say [Laughing] . . .
>
> You know because, believe me, if, if the crap hits the fan I'm going to be calling some brothers and tell them to get their butts up here [Laughing].

The defendant referenced as these "brothers" a group of like-minded ISIL supporters in Maryland, including the former Imam whose Facebook page expressed his avid support for ISIL.  One month prior to these statements to the UCE, on June 24, 2016, the defendant deposited a check in the amount of $1,200 from this individual.  In the memo line was written the word "zakat," referring to the Islamic obligation to give charity.  The following day, on June 25, 2016, the defendant withdrew $500 from an ATM.  That same day, he bought a long gun rifle for $486.00.  He then incurred two overdraft fees because the check had not yet cleared.

### III.   The Defendant's Possession of Components To Construct Illegal Grenades

During his conversations with the UCE, the defendant repeatedly discussed grenades and grenade launchers.   During a consensually recorded conversation on May 1, 2016, the defendant told the UCE that he possessed a 37mm grenade launcher.  There is no *per se* ban on the possession of this type of grenade launcher under federal law.  This launcher can be used to launch smoke grenades, flares or

flashbang grenades.  During one conversation with the UCE, the defendant described what tactics he would employ to commit an attack on a building using these types of grenades and launcher. The defendant also told the UCE that obtaining "HE" (high explosive) grenades would be illegal and proceeded to explain how he could make homemade grenades of this type with 37mm grenade shells.

The defendant described the process of altering 37mm rounds by inserting items such as flechettes (steel, arrow-shaped projectiles), pellets or buckshot.  The defendant said about such a modified 37mm round, "they're highly illegal, it's a destructive device" and that it would have to be registered.  The defendant explained the benefits of having all of the parts necessary to modify 37mm rounds but not assembling them to prevent being caught with such a device.  The defendant also indicated that assembly could be done quickly and easily, telling the UCE: "You know, stuff like that, it's not like it's rocket science you know, so you know. It's really not that complicated, you know."  When law enforcement executed a search warrant at the defendant's residence on July 31, 2016, investigators recovered 37mm grenade shells, a 37mm grenade launcher and numerous rounds of shotgun shells from which homemade destructive devices, of the kind described by the defendant, could be made.

IV.    **The Defendant's Purchase of Grenades**

At one point during the encounters between the UCE and the defendant, the UCE told the defendant that he had a contact in the military who could obtain military grenades.  During a consensually recorded conversation on June 21, 2016, the defendant expressed his interest in obtaining a particular type of 40mm grenade launcher that could be mounted on a rifle, which the defendant stated "was made for combat," as well as high explosive 40mm grenades used in a launcher.  The defendant concluded, telling the UCE: "You've got an intel mission here now, tracking down . . . tracking down some merchandise."

Subsequently, on July 5, 2016, the defendant indicated to the UCE that he had been thinking about some of the complications associated with obtaining that type of equipment.  The defendant stated: "I've got another proposal, see what you think of this, what your take is on this," and asked the UCE, "What do you think would be the possibility of sixty-sevens being easier," noting that there would not be any equipment needed to go along with it.  The defendant was suggesting that it would be easier for him to purchase M67 high explosive fragmentation grenades, which are thrown by hand and do not require a launching device.  When the UCE asked the defendant how many M67 grenades he wanted, the defendant replied that he wanted to "start with" five grenades.

14

On July 15, 2016, the defendant engaged in a discussion with the UCE about the arrangements for his purchase of the M67 grenades.  On July 31, 2016, the defendant and the UCE met at an area gas station where, in exchange for his Beretta M9 handgun, the defendant purchased grenade bodies having 6.5 ounces of Composition B high explosive, which is a combination of the high explosives TNT and RDX, as well as grenade fuses.  (Exhibit 1, attached hereto, is a photograph of one of the grenades).  Gregerson was arrested after illegally purchasing the grenades.

## V.   The Defendant's Intent To Purchase A Claymore Mine

Prior to his arrest, on July 15, 2016, the defendant told the UCE to see if his military contact could provide the defendant with a Claymore mine.  A Claymore mine is an anti-personnel mine that can be detonated remotely.  (Exhibit 2, attached hereto, is a photograph of a Claymore mine).  It contains a layer of C-4 explosive behind hundreds of steel balls that are projected outward at a high velocity upon detonation.  The defendant described the weapon as "a magical piece of equipment there" and noted how it achieves "total destruction."

The defendant inquired about the price of the Claymore mine and discussed with the UCE paying $250.  The UCE subsequently told the defendant that obtaining the Claymore mine would take time.  The defendant responded:

> The believer is patient. This is what separates the believer from the infidels. A believer has patience.  A Muslim can outlast the enemies of Islam.  All

that a believer has to have in jihad in the cause of Allah is patience.  They
have to have patience to outlast the enemy.

A little later in the conversation, the defendant stated "Patience is what
distinguishes the believer from the infidels.  We will outlast them because they can
keep fighting and fighting but eventually they will get tired.  We will not."  The
defendant's statements reflect that his desired purchase of a Claymore mine was to
equip himself as a "believer" conducting jihad in a perceived war against infidels.

It is also clear from the defendant's conversations with the UCE that he
intended to make more purchases from the UCE's military "source."  In addition to
the Claymore mine, the defendant asked the UCE to see if the UCE could arrange
for the defendant to obtain flash bang grenades.  "Just to have a couple tucked
away . . .  That'll always be very useful."  The defendant also talked about the
desirability of keeping the relationship going with the UCE's military contact:
"Cause, like I say, we wanna keep the business relationship going and then if we
can keep money flowing his way and we can get some nice stuff coming our way,
everybody wins."

## VI.   The Defendant's Statements Relating To Committing Violent Acts Consistent With ISIL's Calls For Violence

Results of a search warrant for the defendant's email account revealed that,
on or about March 17, 2015, the defendant sent an e-mail to others with a link to
the translation of a speech by ISIL spokesman Abu Mohammad al-Adnani entitled

"So They Kill and Are Killed," in which Adnani called on followers to "mobilize for jihad," also commanding: "O mujahidin, then rise towards your enemies and intrude upon them…"  On several occasions, the defendant made statements about committing violent acts consistent with ISIL's calls for violence.

### A.     Violence against Muslim Leaders

On May 1, 2016, the defendant and the UCE were sitting in a restaurant when a group of local Muslim religious leaders walked in. The defendant recognized the men, and proceeded to talk with the UCE about committing violent acts against them.  He described the scenario as "like shooting fish in a barrel." The defendant mentioned using the knife he was carrying or the "Mozambique Drill" against them.  According to publicly available information, the Mozambique Drill is commonly understood to mean shooting someone twice in the torso and then once in the head.

The issue of *Dabiq* published on April 13, 2015, which the defendant admitted to the UCE he read regularly, included an article entitled: "Kill the Imams of Kufr [disbelief] in the west," with a subtitle: "Murtaddin [apostates] in the West," which openly encouraged violence against Muslim clerics such as the ones to whom the defendant was referring.  In a conversation with the UCE, the defendant described moderate Mulims as "kufar" and "apostates."

### B.      Violence against Law Enforcement

ISIL has repeatedly called for the murder of law enforcement officers. For example, in an ISIS propaganda video reissued in January, 2015, ISIL spokesman Adnani urged followers in the United States and elsewhere:  " . . . do not let this battle pass you by wherever you may be . . . Strike their police, security and intelligence members, as well as their treacherous agents."

In his conversations with the UCE, the defendant made statements, himself, referencing violent acts against law enforcement.  During a consensually recorded conversation on June 21, 2016, the defendant and the UCE were at a park in Dearborn, Michigan.  The defendant pointed to an individual in uniform in the vicinity, concluding that it was a park ranger.  The defendant pointed out the tactical advantage of "two against one," referring to himself and the UCE versus the park ranger, and then proceeded to describe a way to ambush and attack the park ranger.  The defendant concluded, "People like this, this isn't even a challenge.  You know they talk about all these lone wolves and all this kind of stuff, you know, threats.  Listen, if someone really wanted to do something that knew what they were doing, they could do something, and they could do a lot."

On June 12, 2016, in a consensually recorded telephone conversation, the defendant spoke to the UCE about the attack on the Orlando, Florida nightclub that had occurred that day (resulting in the death of 49 people).  The defendant gave

praise for a successful attack and stated that "Ramadan is the month of victory."
The defendant stated: "May Allah grant this brother jannah [paradise]" and "this
brother saw an evil, and he did something." During the same conversation with the
UCE, the defendant indicated his approval of the January 7, 2015, attack on the
Charlie Hebdo victims in Paris, France (which resulted in the death of twelve
people).

During a recorded conversation on June 21, 2016, the defendant again spoke
about the Orlando night club attack with the UCE. The defendant used the term
"brother" when referring to the attacker, who had stated his allegiance to Abu Bakr
al Baghdadi. Noting that the Orlando attacker had "picked a pretty good target,"
the defendant then discussed how the attacker could have altered his actions to
increase the death toll:

> It wasn't until the brother came out of one of the holes [that
> law enforcement had punched in the wall] and started
> engaging them that they finally took him down. Because,
> honestly if he would have stayed in there with the hostages
> and just been taking pot shots from inside there, who knows,
> you know it could have been going on for 24 hours.

Noting that hostages had been wounded in the incident and then bled to death, the
defendant explained that if the attacker had just stayed in the bathroom longer,
rather than emerging and confronting law enforcement, additional hostages would
have met the same fate. According to the defendant, using this tactic would also

have meant that the attacker would have been in a position to kill law enforcement officers:

> The thing about that, if he would have just kind of stayed in there and held them off for a few more hours even, we would've been talking 75 [fatalities], you know, who knows. Then maybe he could have waited for the cops to come inside and try to pick off a couple of them on the inside, you know, because he would've had a little bit of an advantage."

On June 21, 2016, the defendant indicated that he wanted to purchase a very large caliber revolver.  The defendant noted: "That's one that would surprise the cops, too, that thing.  'Oh you're wearing a vest?'  Bam! 'You've got plates on?' Bam!  'Kevlar helmet?  I don't' think so!' Bam!"

In a conversation on July 27, 2016, the defendant told the UCE, referring to his upcoming purchase of high explosive grenades – ". . . we're supposed to be better prepared than the infidels . . ."  The defendant's statement reflects that his purpose in purchasing the grenades was to outfit himself, to prepare himself for a confrontation with "infidels."  The defendant also talked to the UCE about how he would use the grenades if law enforcement came to his residence.  Gregerson described how that scenario "warranted a full tactical response."

## CONCLUSION

The government submits that there is clear and convincing evidence that there is no condition or combination of conditions of release that would assure the

safety of the community in light of 1) the defendant's purchase of high explosives

grenades -- military weapons whose sole purpose is to injure and destroy; 2) the

defendant's expressed desire to purchase a Claymore mine, another military

weapon which also has no purpose other than to injure and destroy; 3) the

defendant's acquisition of an extensive amount of weapons, ammunition, and

tactical gear; 4) the defendant's identification with and support of ISIL;  5) the

defendant's statements relating to acquiring weapons in order to equip himself, as

ISIL instructs, for a confrontation with "infidels;" and 6) the additional felony

charges against him in the Eastern District of Virginia for unlawfully purchasing

two firearms.   The government, therefore, respectfully requests that the Court

allow the detention order to remain in place.

Respectfully submitted,

BARBARA L. McQUADE
UNITED STATES ATTORNEY

*s/Cathleen M. Corken*
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Phone:  (313) 226-9100
E-Mail: Cathleen.corken@usdoj.gov

Dated: December 22, 2016

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 22, 2016, I filed or caused to be filed the

foregoing document on the ECF system, which will send notice to counsel of record.

<u>*s/Cathleen M. Corken*    </u>
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Phone:  (313) 226-9100
E-Mail: Cathleen.corken@usdoj.gov